# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

RICHARD G. ROPER,

       Plaintiff,

v.                                                  Civ. No. 18-549 GJF

ANDREW SAUL, *Commissioner of
Social Security*,[1]

       Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

THIS MATTER is before the Court upon Plaintiff Richard G. Roper's ("Plaintiff's") "Motion to Reverse and Remand for Payment of Benefits, or in the Alternative, for Rehearing, with Supporting Memorandum" [ECF 19] ("Motion"). The Motion is fully briefed. *See* ECFs 24 (Commissioner's Response), 25 (Reply). Having meticulously reviewed the entire record and the parties' briefing, the Court concludes that the Administrative Law Judge's ("ALJ's") ruling should be **AFFIRMED**. Therefore, and for the reasons articulated below, the Court will **DENY** the Motion.

## I.   FACTUAL BACKGROUND

Plaintiff was born in 1979. Administrative Record ("AR") 62. He graduated from high school in 1997 after taking special education classes. AR 113. He then enlisted in the U.S. Army but received a "general discharge" shortly after completing basic training. AR 394, 584.[2] Since then, he has worked as a laborer, a grocery store clerk, a dishwasher, and most recently as a

---

[1] On June 17, 2019, Andrew Saul was sworn in as Commissioner of Social Security. Consequently, Mr. Saul has been "automatically substituted as a party." FED R. CIV. P. 25(d). Furthermore, because "[l]ater proceedings should be in [his] name," the Court has changed the caption of this case accordingly. *Id.*; *see also* 42 U.S.C. § 405(g) (stating that such an action "survive[s] notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office").

[2] Plaintiff claimed to have received a "general [discharge] with honorable conditions" because of shin splints. AR 584.

deckhand for a water drilling company. AR 113.[3] In July 2011, he applied for social security disability benefits, claiming that he suffered from a disability that began in February 2009 when he was twenty-nine years old. AR 62, 364. He alleged that his disability resulted from three physical conditions (left eye blindness, right ear hearing loss, and headaches) and four psychological conditions (depressive disorder, social phobia, anxiety, and bipolar disorder). AR 112.

In November 2011, the Social Security Administration (SSA) denied Plaintiff's claim, concluding that "[his] condition was not severe enough to be considered disabling" and that "[he] could have done some types of work." AR 30, 372. In October 2013, upon Plaintiff's request for reconsideration, the SSA again denied his claims and again concluded that "[his] condition [was] not severe enough to keep [him] from working." AR 35, 378. Plaintiff then requested a hearing, which was held in September 2014 before ALJ Ann Farris. AR 38, 382, 388. In January 2015, the ALJ concluded that Plaintiff had not been under a disability. AR 14, 25. In September 2015, the Appeals Council denied Plaintiff's request to review the ALJ's decision and affirmed that decision as the Commissioner's final decision. AR 5.

In November 2015, Plaintiff timely filed in this District a petition for relief. *See Roper v. Berryhill*, Civ. No. 15-1045, 2017 U.S. Dist. LEXIS 35955, at *4 (D.N.M. Mar. 14, 2017). In March 2017, U.S. Magistrate Judge Kirtan Khalsa concluded that the ALJ (1) "failed to apply the correct legal standards in evaluating the opinions of [a treating physician and an examining consultant]" and (2) "improperly adopted certain findings of [the nonexamining psychological

---

[3] He claimed that from January 2007 to June 2010, he worked twelve-hour days, seven days per week—"off and on"—for a particular water drilling company. AR 113. In addition, although not perhaps not typical "employment," he was at least until mid-2014 paid in drugs—which he used to support his methamphetamine habit—to pick up and drop off packages, the contents of which apparently remained unknown to him. AR 395-96, 435 (Plaintiff, upon being asked whether "this [was] for drug dealers," stating that "I couldn't tell you what I was dropping off and picking up" and "I didn't ask any questions"); *see also* Mot. 13. In addition, in January 2018, his mother testified that she helped him find "temporary jobs that were basically under the table," such as "substitute dishwashing." AR 595, 601.

consultants] . . . while rejecting others without explanation." *Id.* at *36. Consequently, Judge Khalsa remanded the case to the SSA, and in January 2018, Plaintiff attended another hearing before the same ALJ. AR 566. In February 2018, the ALJ issued another unfavorable decision, and in June 2018, Plaintiff again timely petitioned this Court for relief. Compl., ECF 1.[4]

## II.  PLAINTIFF'S CLAIMS

Plaintiff now asserts that the ALJ erred in finding that he nevertheless had the "residual functional capacity" ("RFC") to perform a "a limited range of [light] work." Mot. 1; AR 438. Specifically, he argues that the ALJ erred in (1) weighing the opinions of state agency consultants and (2) relying on Plaintiff's "long history of being non-medically compliant." Mot. 6-24.

Plaintiff also contends that the ALJ's conclusion that he could "successful[ly] adjust[] to other work . . . in the national economy" was erroneous because it was (1) based on an erroneous RFC and (2) contained a "likely inconsistency" between the vocational expert testimony and the Dictionary of Occupational Titles ("DOT") that "the ALJ failed to explore." Mot. 24-25; Reply 8; AR 447.

## III. APPLICABLE LAW

### A.  Standard of Review

The Court's review of an ALJ's decision[5] is both legal and factual. *See Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008) ("The standard of review in a social security appeal is whether the correct legal standards were applied and whether the decision is supported by substantial evidence." (citing *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497-

---

[4] *See also* AR 430 (ALJ's "Notice of Decision" stating that, absent intervening action by Plaintiff or the Appeals Council, the ALJ's decision would "become final" 61 days after the February 2018 date of notification—and that Plaintiff would then have 60 days after that to "file a new civil action in Federal district court").

[5] Under 42 U.S.C. § 405(g), courts review the Commissioner's "final decision," which in this case is the ALJ's February 2018 decision. *See supra*, note 4.

98 (10th Cir. 1992))).

In determining whether the correct legal standards were applied, the Court reviews "whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (quoting *Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005)). The Court may reverse and remand if the ALJ failed to "apply correct legal standards" or "show . . . [he or she] has done so." *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citing *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996)).

The Commissioner's findings "as to any fact, if supported by substantial evidence, *shall* be conclusive." 42 U.S.C. § 405(g) (emphasis added). "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (brackets in original) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "And . . . the threshold for such evidentiary sufficiency is not high. Substantial evidence, [the Supreme] Court has said, is more than a mere scintilla." *Id.* (internal quotation marks and citation omitted). "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted).

Under this standard, a court should still meticulously review the entire record, but it may not "reweigh the evidence nor substitute [its] judgment for that of the agency." *Newbold v. Colvin*, 718 F.3d 1257, 1262 (10th Cir. 2013) (quoting *Branum v. Barnhart*, 385 F.3d 1268, 1270 (10th Cir. 2004)); *Hamlin*, 365 F.3d at 1214. Indeed, a court is to "review only the *sufficiency* of the evidence, not its weight." *Oldham v. Astrue*, 509 F.3d 1254, 1257 (10th Cir. 2007) (emphasis in original). Therefore, "[t]he possibility of drawing two inconsistent conclusions from the evidence

does not prevent an administrative agency's findings from being supported by substantial evidence." *Lax*, 489 F.3d at 1084 (quoting *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)). Furthermore, a court "may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Id.* (quoting *Zoltanski*, 372 F.3d at 1200) (brackets omitted).

Ultimately, if the correct legal standards were applied and substantial evidence supports the ALJ's findings, the Commissioner's decision stands and Plaintiff is not entitled to relief. *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Hamlin*, 365 F.3d at 1214.

### B.  Sequential Evaluation Process

To qualify for disability benefits, a claimant must establish that he or she is unable to "engage in *any* substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (emphasis added).

The SSA has devised a five-step sequential evaluation process to determine disability. *See* 20 C.F.R. § 404.1520(a)(4); *Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). The claimant bears the burden of proof at steps one through four. *See Bowen v. Yuckert*, 482 U.S. 137, 146 & n.5 (1987); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005); *Williams v. Bowen*, 844 F.2d 748, 750-51, 751 n.2 (10th Cir. 1988). In the first four steps, the claimant must show (1) that "he is not presently engaged in substantial gainful activity," (2) that "he has a medically severe impairment or combination of impairments," and either (3) that the impairment is equivalent to a

listed impairment[6] or (4) that "the impairment or combination of impairments prevents him from performing his past work." *Williams*, 844 F.2d at 750-51; *Grogan*, 399 F.3d at 1261.

If the claimant has advanced through step four, the burden of proof then shifts to the Commissioner to show that the claimant nonetheless retains sufficient RFC "to perform other work in the national economy in view of his age, education, and work experience." *Yuckert*, 482 U.S. at 142, 146, n.5.

### C. Complying with a Court's Remand

"[T]he administrative agency, on remand from a court, [is required] to conform its further proceedings in the case to the principles set forth in the judicial decision, unless there is a compelling reason to depart." *Grigsby v. Barnhart*, 294 F.3d 1215, 1218 (10th Cir. 2002) (quoting *Wilder v. Apfel*, 153 F.3d 799, 803 (7th Cir. 1998)) (citing *Brachtel v. Apfel*, 132 F.3d 417, 419-20 (8th Cir. 1997)).

## IV. ALJ'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

In her February 2018 written decision, the ALJ affirmed that she carefully considered "all the evidence" and "the entire record." AR 433, 438, 440.

### A. Steps One through Three

At step one, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since February 23, 2009, the alleged onset date of his disability. AR 434-35.[7] At step two, the

---

[6] If the claimant can show that he has a listed impairment, he will be found to be disabled and no further steps will be analyzed. 20 C.F.R. § 404.1520(a)(4)(i-iv). Otherwise, if no listed impairment can be shown, the analysis moves on to step four. *Id.*

[7] Although Plaintiff still performed documented worked after this date, the ALJ found that such work did not qualify as "substantial gainful activity" because his documented earnings ($3,864 in 2009 and $279 in 2010) were below the applicable limit of $1,000 per month. *Id.* (citing 20 C.F.R. § 404.1574(b)). In addition—although he was "paid in drugs" for "picking up and dropping off packages" at least as late as 2014 and worked "under the table" at various other times—the ALJ was "unable to determine whether [Plaintiff] made [substantial gainful activity] doing these [undocumented] jobs," as his earnings from these jobs could not be verified. AR 395-96, 435, 595, 601.

ALJ found that Plaintiff had the following "severe" impairments: left eye blindness, obesity, polysubstance abuse, bipolar disorder, and schizophrenia. AR 435. The ALJ also considered Plaintiff's other impairments[8] but found them to be non-severe. AR 435-36. At step three, the ALJ found that no impairment or combination thereof satisfied the criteria of a listed impairment. AR 436-38.

## B. Residual Functional Capacity

Before performing the step four analysis, in which the ALJ considers whether a claimant can perform past work, the ALJ must first determine the claimant's RFC.[9] Here, the ALJ found that Plaintiff had the physical RFC to perform light work. AR 438 (citations omitted).[10] She also found that he had the mental RFC to "follow short, simple instructions"—but limited him to having "no interaction with the general public" and "only occasional and superficial interaction with coworkers." *Id.* As described below, the ALJ also discussed the evidence and reasoning that led to these RFC findings.

### 1. *Plaintiff's Allegations*

The ALJ began by reviewing Plaintiff's allegations that he "experienced daily withdraw[al], isolation, overwhelming anger, breaking things, difficulty sleeping, memory issues, racing thoughts and deep depression," along with "blind[ness] in his left eye, . . . social phobia,

---

[8] *I.e.*, asthma, insomnia, decreased hearing in the right ear, headaches, and a gunshot wound in the left leg. AR 435-36.

[9] *See* 20 C.F.R. § 404.1520(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity."); *but cf. Winfrey*, 92 F.3d at 1023 (describing the RFC determination as technically the first part of step four).

[10] Specifically, she found that Plaintiff had the physical RFC to "lift and/or carry 20 pounds occasionally and 10 pounds frequently. He can stand and/or walk for 6 hours out of an 8-hour workday with normal breaks. He can sit for 6 hours out of an 8-bour workday with normal breaks. His ability to push and/or pull is limited by his ability to lift and/or carry. He lacks peripheral vision to the left." *Id.*; *see also* AR 19 (ALJ's initial decision from January 2015, finding that Plaintiff had the RFC to "perform a *full* range of work at *all* exertional levels" but had no depth perception or peripheral vision on the left (emphasis added))

anxiety, bipolar disorder and headaches." AR 439 (citations omitted). The ALJ also reviewed his

assertion that "his ailments affected his ability to understand, see, remember, follow instructions,

hear, concentrate, complete tasks and get along with other people." *Id.* (citation omitted). As

discussed below, however, the ALJ found that Plaintiff's "statements concerning the intensity,

persistence and limiting effects of [his] symptoms [were] not entirely consistent with the medical

evidence and other evidence in the record." AR 440.

        2.  *ALJ's Assessment*

        a.  <u>Medical Evidence</u>

After assessing Plaintiff's physical impairments,[11] the ALJ reviewed the medical evidence

regarding Plaintiff's mental impairments. AR 438-446. The ALJ observed that Plaintiff obtained

counseling in early 2009 for methamphetamine and marijuana use,[12] while also reporting anxiety

and depression. AR 441. The ALJ explicitly noted, however, that Plaintiff "reported no previous

mental health [or] substance abuse treatment" and "reported he had no significant health

problems." *Id.* (citing AR 315-323).[13]

The ALJ then reviewed the treatment records of Karla Vitale, D.O., who began seeing

Plaintiff in November 2010 due to "concerns about his mental health." *Id.* (quoting AR 144). Dr.

Vitale diagnosed Plaintiff with "unspecified bipolar disorder" and "depression with anxiety" and

---

[11] The ALJ's findings regarding Plaintiff's physical impairments are not at issue in this case. *See* Mot. 6-25. Consequently, the Court simply notes that in assessing Plaintiff's physical impairments, the ALJ reviewed the opinions of two agency consultative examiners (one noting an "unremarkable physical examination" and one opining that "no significant" physical limitation existed apart from Plaintiff's left eye blindness) and two agency medical examiners (both of whom found Plaintiff had "no severe physical impairments"). AR 440-41. In addition, she found *no* evidence that Plaintiff "obtain[ed] *any* physical healthcare" from 2013 to 2018. AR 442 (emphasis added).

[12] *See also* AR 305, 322, 441 (Plaintiff reporting that he "habitually" used "marijuana and meth[amphetamines] since age 10," including by smoking marijuana "several times a day every day," had once "spent up to 10,000.00 [dollars] in 2 days for drugs," and had "multiple drug-related criminal charges and incarcerations over several years").

[13] The ALJ also noted that Plaintiff obtained such counseling services "off and on in 2009 and 2010," attended "some counseling session in 2011," and was discharged from such services in May 2013 "due to not having obtained services for 90 days." AR 441-42 (citing AR 187-332).

prescribed him medications.  AR 145, 442.  The ALJ explicitly noted, however, that the record

contained no "opinion from Dr. Vitale regarding [Plaintiff's] functional limitations," which

prevented the ALJ from "assign[ing] weight to it."  AR 442.[14]  The ALJ nevertheless noted that

Dr. Vitale described Plaintiff as "noncompliant and difficult to treat," "not interested in

discontinuing his marijuana use," not seeking care for three months (even though he was advised

to return in six weeks), and no longer in counseling.  *Id.* (citing AR 132-39 (also noting Plaintiff's

continued use of methamphetamines and the multiple times the "cessation of illicit drugs" was

encouraged)).

The ALJ also noted that in 2013 Plaintiff mentioned to an agency consultative examiner

that he had been off all psychotropic medication for the past year and that "he thought 'he [was]

doing okay.  He [did] not feel suicidal or feel like he need[ed] counseling.'" AR 440 (quoting AR

357).

### b.  Opinions of Dr. LaCourt

In her *previous* decision from January 2015, the ALJ reviewed two opinions of State

agency examining psychological consultant David LaCourt, Ph.D., one from November 2011 and

the other from May 2013, and gave them "little weight" for the following reasons:

> I have afforded little weight to the [two] opinions of Dr. LaCourt, as he seems to
> have relied heavily on [Plaintiff's] subjective reports, which even he indicated were
> not entirely accurate.  Further, Dr. LaCourt did not adequately explore [Plaintiff's]

---

[14] *See also* AR 132-146 ("Progress Notes" from Dr. Vitale containing no opinion on Plaintiff's functional limitations); Mot. 17-18 (discussing Plaintiff's statements to Dr. Vitale from these progress notes along with the medications she prescribed him—but containing no reference to any opinion by this doctor on Plaintiff's functional limitations).  Judge Khalsa, however, previously found that the ALJ—in her previous decision—weighed Dr. Vitale's *opinion* when she expressly assigned "not significant weight" to Dr. Vitale's "findings" (i.e., the diagnoses of bipolar disorder, depression with anxiety, and insomnia) and implicitly rejected them by not identifying them as either "severe or non-severe impairments."  *Roper*, 2017 U.S. Dist. LEXIS 35955, at *14-17.  Although Judge Khalsa then found that the ALJ committed reversible error in weighing this opinion—specifically by (1) "[s]kipping step one . . . [and] step two" in evaluating such a treating physician's opinion and (2) prematurely considering whether Plaintiff's drug abuse materially contributed to his disability, *see id.* at *16-22—Plaintiff does not argue that the ALJ in her instant decision erroneously declined to weigh, or somehow again incorrectly weighed, an opinion by Dr. Vitale.  *See* Mot. 7-25.

current use of substance abuse and the effects his substance abuse has on his mental functioning.

*Roper*, 2017 U.S. Dist. LEXIS 35955, at *22-25.  Judge Khalsa, however, held that the ALJ did not apply the correct legal standards in evaluating these two opinions when she (1) prematurely relied on the lack of an established connection between his drug use and his mental functioning, (2) "failed to demonstrate that she considered any of the [six] regulatory factors," and (3) relied excessively on Plaintiff's subjective complaints.  *Id.* at *26-30 (citations omitted).

In her February 2018 decision, which is under review in the instant case, the ALJ again reviewed these two opinions from Dr. LaCourt.  AR 442-43.  First, the ALJ observed that Dr. LaCourt opined in 2011 that Plaintiff—who during his mental status examination "denied recent involvement with illicit substances"—had "bipolar I disorder"[15] and that this diagnosis was associated with four "marked limitations"[16] and two "moderate limitations."[17]  The ALJ then explained why she gave "some weight" to this 2011 opinion:

> Some weight is given to this opinion as Dr. LaCourt is an acceptable medical source under the regulations.  More weight is not given to his opinion, however, as he based it on the subjective information[—]including the report that he did not use drugs[—]that [Plaintiff] reported during a single appointment, while he reached different conclusions regarding the claimant's mental diagnoses in his two opinions.  Furthermore, his opinion that [Plaintiff] had marked limitations in ability to carry out instructions, to work without supervision and to interact with

---

[15] Specifically, "bipolar I disorder, recurrent, last depressive episode, severe, without psychotic symptoms."  AR 155, 442.

[16] *I.e.*, "carrying out instructions," "working without supervision," "[s]ocial interaction . . . with coworkers," and "[s]ocial interaction . . . with supervisor."  AR 156, 442.

[17] *I.e.*, "[u]nderstanding and remembering detailed/complex instructions" and "[s]ocial interaction . . . with the public."  AR 156, 442.

supervisors and coworkers is inconsistent with [Plaintiff's] testimony regarding how he obtained methamphetamines during this period.

AR 442.[18]

The ALJ then reviewed Dr. LaCourt's May 2013 opinion that Plaintiff—who during his second examination with Dr. LaCourt reported that he was now living with a wife, taking no medication, and had not "us[ed] methamphetamines in several years"—had schizophrenia and that this diagnosis was associated with two "marked limitations,"[19] two "moderate-to-marked limitations,"[20] and three "moderate limitations."[21] The ALJ then also explained why she gave "some weight" to this 2013 opinion:

> Some weight is given to Dr. LaCourt's 2013 opinion as he is an acceptable medical source under the regulations. More weight is not given to his opinion as he came to different conclusions in his 2011 and 2013 opinions regarding [Plaintiff's] diagnoses and his limitations related to the same, while the limitations he placed on [Plaintiff] are undermined by [Plaintiff's] report that he was married, an event that must have occurred between the two examinations as the claimant reported in mid-2011 that he was single. Furthermore, Dr. LaCourt's opinion is undermined by

---

[18] In what appears to be either a formatting or perhaps copying error, the opinion is essentially devoid of any dash punctuation marks, be it the longer ("—") or shorter ("–") version of this mark. (There is, however, one exception where a "--" mark is used in the standard language describing the "two-step process" for considering a claimant's symptoms. *See* AR 439.) Instead, the opinion seems to contain extra spacing where such marks should be, including in the language quoted above. *See also* AR 429 ("Notice of Decision   Unfavorable"), 439 (ALJ noting mother's testimony that "the claimant   whom she saw daily   went to Walmart once a month"), 441 (ALJ noting that "the claimant   who reported no previous mental health of substance abuse treatment and reported he had no significant health problems   obtained counseling" in 2009 for his drug use), 442 (ALJ noting Dr. LaCourt's statement that "the claimant   who denied using drugs or alcohol   had bipolar I disorder"), 443 (two more similar errors).

[19] *I.e.*, "working without supervision" and "[u]se of public transportation/travel to unfamiliar places." AR 338-39, 443.

[20] *I.e.*, "carrying out instructions" and "[s]ocial interaction with supervisor." AR 338-39, 443.

[21] *I.e.*, "[s]ocial interaction . . . with the public," "[s]ocial interaction with . . . coworkers," and "being aware of normal hazards/reacting appropriately." AR 338-39, 443.

[Plaintiff's] testimony that he shops at Walmart, has a roommate and watches television daily.

AR 443.

### c. Opinions of Drs. Henderson and Walker

In her *previous* decision from January 2015, the ALJ stated that, aside from further limiting Plaintiff to "no interaction with the public," she was "otherwise finding essentially *identical* limitations" as those found by State agency nonexamining psychological consultants Jerry Henderson, Ph.D. and Scott R. Walker, M.D. *Roper*, 2017 U.S. Dist. LEXIS 35955, at *30-31 (emphasis added). Judge Khalsa, however, found that the "the ALJ's RFC failed to address all the limitations assessed by the State agency consultants *upon which she relied*." *Id.* at *35 (emphasis added). Consequently, as the ALJ—without explanation—"chose some but not all of the[se] limitations," Judge Khalsa held that her mental RFC finding was not supported by substantial evidence. *Id.* (citations omitted).

In her February 2018 decision, the ALJ again reviewed the opinions of Drs. Henderson and Walker. The ALJ specifically reviewed a form from 2011, which Dr. Henderson used to assess moderate limitations in twelve (out of twenty) subcategories (Section I, Summary Conclusions) and to provide a narrative assessment regarding those ratings (Section III, Functional Capacity Assessment). AR 174-76, 443.[22] In his narrative assessment, Dr. Henderson opined that Plaintiff's alleged "ADLs [activities of daily living] appear[ed] only partially credible," given the "overal

---

[22] *See also* AR 174 (noting that Section I ratings are for "summary conclusions derived from the evidence" and that Section III is for "[d]etailed explanation of the degree of limitation").

[sic] objective medical evidence which supports retention of capacity for simple and repetitive tasks in an environment in which interpersonal contact is only incidental." AR 176.

The ALJ also reviewed a similar form from 2013, in which Dr. Walker assessed moderate limitations in thirteen subcategories and then also provided a narrative assessment. AR 341-43, 443-44. In his narrative assessment, Dr. Walker found that Plaintiff had "[g]rossly eroded credibility given [his] shifting life," that "[o]nly Meth/M[arijuana] use appear[ed] constant," and that Plaintiff did not report to treatment because "he does not feel he needs it." AR 343. Regarding Plaintiff's mental limitations, Dr. Walker opined that Plaintiff could "understand, remember and carry out simple instructions, make simple decisions, attend and concentrate for two hours at a time, interact adequately with co-workers and supervisors, and respond appropriately to changes in a routine work setting." *Id.*

The ALJ gave each of these opinions "some weight" for the following reasons:

Some weight is given to Dr. Henderson's [opinion] as he is an acceptable medical source under the regulations whose opinion is generally consistent with objective treatment records. More weight is not given to this opinion as [Plaintiff] subsequently reported that he lives with a roommate, shops at Walmart, plays video games and watches television daily, activities which indicate[] that he is less limited than Dr. Henderson opined.

. . .

Some weight is given to Dr. Walker's opinion as he is an acceptable medical source under the regulations whose opinion is largely supported by objective treatment records. More weight is not given to his opinion, however, as his opinions were inconsistent in places between the two forms that he completed, while he appears

to have not addressed Dr. LaCourt's 2013 opinion that the claimant had schizophrenia.

AR 443-44.

### d. Other Evidence

The ALJ also considered "other evidence" in making her RFC findings. For example, the ALJ considered that "[t]he evidence of record lacks information on the claimant obtaining *any* care for his mental impairments from May 2013 to [February 2018]." AR 444 (emphasis added); *see also* AR 445 (ALJ noting Plaintiff's January 2018 testimony that "he had recently obtain[ed] insurance and was in the process of re-starting counseling"—but that he did not "explain why he had been without insurance, why he had not obtained insurance sooner or why he had not sought care for his allegedly disabling conditions for approximately 5 years"). The ALJ also observed that Plaintiff's sporadic earning record—documenting a *lifetime* earnings of less than $69,000 since he began working in 1994—suggested "a lack of attachment to the workplace for reasons *unrelated* to his alleged severe impairments." AR 445 (emphasis added); *see also id.* (also noting that Plaintiff's "criminal history might affect his ability to obtain employment").

The ALJ observed that—in addition to a nearly five-year gap in treatment—Plaintiff had "a long history of being nonmedically compliant," which included "continuing his polysubstance use against medical advice," "not following up with providers as directed," and "not promptly filling prescribed medications." *Id.* In addition, regarding the treatment he did obtain, the ALJ found that he obtained "only *irregular* care for his alleged disabling mental conditions." *Id.* (emphasis added). Finally, the ALJ noted that "the evidence of record lacks a medical opinion

indicating that [Plaintiff] is unable to work, while it instead indicates that he had significant substance use issues that affect his mental health and treatment for the same." *Id.*

### C. Steps Four and Five

At step four, given the RFC described above, the ALJ found that Plaintiff was unable to perform his past relevant work, which was classified by the vocational expert as "very heavy work." AR 446. At step five, however, the ALJ found that Plaintiff was able to successfully adjust "to other work that exists in significant numbers in the national economy." *Id.* In doing so, she considered the vocational expert's testimony that Plaintiff could "perform the requirements of representative occupations," such as a marker, a cleaner/housekeeper, and a cafeteria attendant, and found this testimony to be consistent with the DOT. *Id.*[23] Consequently, the ALJ concluded that Plaintiff "has not been under a disability, as defined in the Social Security Act." *Id.*

## V. ANALYSIS

### A. The ALJ Did Not Err in Weighing the Agency Consultants' Opinions

Plaintiff argues that the ALJ's RFC findings are erroneous because she erred in weighing the opinions of (1) the examining consultant, Dr. LaCourt and (2) the nonexamining consultants, Drs. Henderson and Walker. Mot. 6-23.

#### 1. Applicable Legal Standards

##### a. Considering Substance Abuse

The Contract with America Advancement Act of 1996 provides that "[a]n individual shall not be considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C.

---

[23] *See also* DOT at ¶¶ 209.587-034, 323.687-014, 311.677-010 (classifying the cleaner/housekeeper occupation as requiring level-one reasoning and the marker and cafeteria attendant occupations as requiring level-two reasoning); *infra* Section V(C) (further discussing level-two reasoning).

§ 423(d)(2)(C). Thus, if the ALJ finds that an individual is "disabled"—but the ALJ nonetheless has "medical evidence of [that individual's] drug addiction or alcoholism"—the ALJ must then "determine whether [his or her] drug addiction or alcoholism is a contributing factor material to the determination of disability." 20 C.F.R. § 404.1535(a); *see also* § 404.1535(b) (stating that the "key factor" in such a determination is "whether [the ALJ] would *still* find [the individual] disabled if [he or she] stopped using drugs or alcohol" (emphasis added)); *Drapeau v. Massanari*, 10 Fed. Appx. 657, 662 (10th Cir. 2001) (unpublished) (holding that "a finding of disability is a condition precedent" and finding error when "the ALJ failed to determine whether plaintiff was disabled *prior* to finding that alcoholism was a contributing factor material thereto" (emphasis added) (citations omitted)).

### b. Weighing Medical Opinions

"An ALJ must evaluate every medical opinion in the record, although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional." *Hamlin*, 365 F.3d at 1215 (citing 20 C.F.R. § 404.1527(c)). For example, "[t]he ALJ is required to give controlling weight to the opinion of a treating physician" if certain conditions are met. *Id.*[24] In contrast, "[t]he opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all." *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) (citing § 404.1527(c)(1)-(2)).[25]

---

[24] *I.e.*, if the opinion is "supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record." *Id.* (citing § 404.1527(c)(2)). "The treating physician's opinion is given particular weight because of his 'unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.'" *Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003) (quoting § 404.1527(c)(2)).

[25] *See also Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012) (stating that an "examining medical-source opinion is, as such, . . . presumptively entitled to more weight than a doctor's opinion derived from a review of the medical

"[I]n determining what weight to give any medical opinion," the ALJ "must also consider a series of [six] specific factors." *Hamlin*, 365 F.3d at 1215 (citation omitted).[26] The ALJ, however, is not required to "explicitly discuss" or "apply expressly each of the six relevant factors in deciding what weight to give a medical opinion." *Oldham*, 509 F.3d at 1258 (citations omitted).[27] Rather, "[i]n addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Frantz v. Astrue*, 509 F.3d 1299, 1302 (10th Cir. 2007) (quoting *Clifton*, 79 F.3d at 1010).[28] And in discussing the weight given to a medical opinion, if "[t]he ALJ provided *good reasons*"—e.g., by making clear both "the weight" given and "the reasons for that weight"—then "[n]othing more was required." *Oldham*, 509 F.3d at 1258 (emphasis added) (quoting *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) (citing 20 C.F.R.

---

record" (citations omitted)); *Winfrey*, 92 F.3d at 1022 (stating that "because [a doctor] did not examine plaintiff, his opinion was not entitled to as much weight as that of" one who did).

[26] These factors include (1) the examining relationship between the medical source and the claimant, (2) the treatment relationship, including its length, nature, and extent as well as the frequency of examination, (3) the degree to which the medical source presents and explains evidence to support a medical opinion, (4) the consistency of the opinion with the record as a whole, (5) whether the opinion is from a specialist and is about an issue related to the medical source's specialty, and (6) other factors that are brought to the ALJ's attention. *Id.*; 20 C.F.R. § 404.1527(c)(1)-(6).

[27] *See also Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996) (stating that while "[t]he record must demonstrate that the ALJ *considered* all of the evidence, . . . an ALJ is not required to *discuss* every piece of evidence" (emphasis added) (citation omitted)).

[28] *See also id.* (finding error when the ALJ "*ignored* evidence from [a clinical nurse specialist] that would support a finding of disability while highlighting evidence favorable to the finding of nondisability" when "the ALJ referred to some of the evidence gleaned from [a clinical nurse specialist's] treatment notes but did not discuss what weight he gave to her opinion" (emphasis added)); *id. at* 1302-03 (finding that, after apparently "accepting some of the moderate limitations in the Mental RFC form completed by . . . a nonexamining physician," the ALJ erred when—without any *consideration* or *discussion*—he inexplicably rejected other moderate limitations); *Haga v. Astrue*, 482 F.3d 1205, 1207-08 (10th Cir. 2007) (finding that the ALJ erred because "it [was] *simply unexplained* why the ALJ adopted some of [the consulting doctor's] restrictions but not others" (emphasis added)); *Robinson*, 366 F.3d at 1083 (stating that an ALJ may not simply "pick and choose from a medical opinion" and finding error when the ALJ "failed to provide *any explanation* of how he assessed the weight of the treating physician's opinion" (emphasis added) (citation omitted)).

§ 404.1527(c)(2) (requiring the ALJ to "give good reasons" for the weight given to a treating source's opinions)).[29]

## 2. The ALJ Properly Weighed Dr. LaCourt's Opinion

Plaintiff argues that in weighing the opinions of the examining psychological consultant, Dr. LaCourt, the ALJ erred by *again* prematurely considering the extent to which Plaintiff's substance abuse contributed to his mental limitations. Mot. 11-12; Reply 1-2; *Roper*, 2017 U.S. Dist. LEXIS 35955, at *29. He then argues that the factors considered by the ALJ—e.g., the inconsistencies between Dr. LaCourt's two opinions, Plaintiff's questionable package-delivery employment, and Plaintiff's activities—were "insufficient" to afford Dr. LaCourt's opinions only "some" weight. Mot. 12-15; Reply 3-4. Finally, he argues that the ALJ was required to either discuss or adopt certain "facet[s]" of Dr. LaCourt's opinion and to discuss the consistency of Dr. LaCourt's opinions with other records. Mot. 14-21. As explained below, the Court disagrees.

### a. The ALJ Did Not Prematurely Consider the Effects of Plaintiff's Drug Abuse

First, the ALJ did not error, or fail to comply with the Court's remand, by prematurely considering the effects of Plaintiff's drug abuse on his mental functioning. Previously, the ALJ in her initial January 2015 decision had given Dr. LaCourt's opinions little weight because, *inter alia*, he "did not adequately explore [Plaintiff's] current use of substance abuse and the effects his

---

[29] Although *Oldham*, 509 F.3d at 1258, involved only a *treating* source's medical opinion, similar "good reasons" are also required for *examining* and *nonexamining* medical-source opinions. *See Chapo*, 682 F.3d at 1291 (noting that "[a]n opinion found to be an examining rather than treating medical-source opinion may be dismissed or discounted" when the ALJ considers "the [six] factors . . . [and] 'provide[s] specific, legitimate reasons for rejecting it.'" (quoting *Doyal*, 331 F.3d at 764)); *Doyal*, 331 F.3d at 761, 764 (holding that the ALJ's rejection of a medical opinion was "properly supported in the record"—even though he "dealt briefly" with that opinion and expressly relied on only one of the six factors—when "[s]ubstantial evidence support[ed] his decision on this point"); *Golden-Schubert v. Comm'r*, No. 18-1415, 2019 U.S. App. LEXIS 22526, at *12 (10th Cir. Jul. 30, 2019) (unpublished) (holding that "the ALJ applied the correct legal standard in weighing [a nonexamining psychological consultant's] opinion" when the ALJ "specified the weight he gave to [the consultant's] opinion, articulated the reason for that weight, and cited those portions of the record that supported that reason").

substance abuse has on his mental functioning." *Id.* at *25 (emphasis added). Thus—in finding that Plaintiff was not disabled—the ALJ had erroneously, i.e. prematurely, relied on the *causal* relationship between Plaintiff's drug use and his mental limitations. The extent of such a relationship, however, is only to be considered *after* the ALJ first finds that the Plaintiff is disabled. 20 C.F.R. § 404.1535(a)-(b); *Drapeau*, 10 Fed. Appx. at 662. Consequently, Judge Khalsa found that the ALJ failed to comply with the legal standard that she "assess first whether [Plaintiff] was disabled *before* she considered whether his drug abuse was a contributing material factor." *Roper*, 2017 U.S. Dist. LEXIS 35955, at *20, 29 (emphasis added) (citing *Drapeau*, 10 Fed. Appx. at 662).

In contrast, the ALJ in her instant February 2018 decision stated that she was now giving "some," but not more, weight to Dr. LaCourt's 2011 opinion because, *inter alia*, "he based it on the *subjective information*[—]including the report that he did not use drugs[—]that [Plaintiff] reported during a *single appointment*." AR 442. Thus, the ALJ no longer discounted this opinion because of the *causal effect* of the drug-related information that Dr. LaCourt failed to consider— but rather because of the *overall reliability* of the "subjective information" that Dr. LaCourt did consider (which appeared to contain at least one misrepresentation, specifically that Plaintiff's recent past had been drug-free, *see* AR 155, 442). Consequently, the Court finds that the ALJ, in concluding Plaintiff was not disabled, did not consider whether Plaintiff's drug abuse was "a contributing factor material thereto." *Drapeau*, 10 Fed. Appx. at 662.

b. The ALJ Provided Good Reasons in Weighing Dr. LaCourt's Opinion

The ALJ provided good reasons for the weight she gave to Dr. LaCourt's opinions. The ALJ explained that she gave Dr. LaCourt's opinions "some weight" because of (1) the "subjective [and seemingly misrepresented] information . . . [from] a single appointment" on which at least

the 2011 opinion was based, (2) the "different conclusion in his . . . opinions regarding [Plaintiff's] diagnoses and his limitations," (3) the opined "marked limitations in [Plaintiff's] ability to carry out instructions, to work without supervision and to interact with supervisors and coworkers [being] *inconsistent* with [Plaintiff's] testimony regarding how he obtained methamphetamines," and (4) Plaintiff's activities (including an apparent marriage sometime between 2011 and 2013, "shop[ping] at Walmart, [having] a roommate and watch[ing] television daily"). AR 442-43. Although the ALJ did not—and was not required to—"apply expressly each of the six relevant factors," *Oldham*, 509 F.3d at 1258, the Court finds that she at least considered these factors, while nevertheless at least some of these factors.[30] Furthermore, as the ALJ gave specific and legitimate explanations for giving "some weight" to Dr. LaCourt's opinion, this Court holds that she "provided good reasons in [her] decision for the weight [she] gave to [these] opinions." *Oldham*, 509 F.3d at 1258. Consequently, "[n]othing more was required." *Id.*[31]

### c. Plaintiff's Additional Assertions Regarding the Weighing of Dr. LaCourt's Opinions Are Without Merit

This Court rejects Plaintiff's assertions that the ALJ was required to either discuss or adopt certain "facet[s]" of Dr. LaCourt's opinions, namely his ratings of Plaintiff's pace (i.e., "concentration/task persistence, for carrying out detailed instructions") and of Plaintiff's ability to deal with supervisors. *See* Mot. 12-15; Reply 3-4; AR 156, 338. First, although the ALJ is required to discuss "significantly probative evidence he rejects," *Clifton*, 79 F.3d at 1010, the Court is not convinced that such ratings were either (1) "significantly probative" (especially in light of the

---

[30] *See supra* note 26 (summarizing the six factors in 20 C.F.R. § 404.1527(c)(1)-(6), which include the "examining relationship," how the evidence presented "support[ed] the medical opinion," the opinion's consistency "with the record as a whole," "*any* [other] factors . . . [that] tend to support or contradict the medical opinion" (emphasis added)).

[31] *See also supra* note 29 (discussing "good reasons").

weight given to Dr. LaCourt's opinion and the "good reasons" supporting that weight) or (2) not discussed (especially in light of the ALJ's explicit reason for discounting these ratings).[32] Furthermore, Plaintiff points to no authority requiring the ALJ to explain not only the weight she gave to an opinion—but then to also "explain how she weighed [each] *facet* of [an] opinion" (or at least each facet she did not adopt.) Mot. 14 (emphasis added).[33]  Consequently, the Court holds that the ALJ was not required to either further discuss or adopt these limitations regarding Plaintiff's "pace and his ability to deal with supervisors," Mot. 12-15; Reply 3-4, that were found within Dr. LaCourt's already-adequately-weighed opinions.

This Court also rejects Plaintiff's assertion that the ALJ was required to discuss the consistency of Dr. LaCourt's opinions with other treatment records.  Mot. 15-21; Reply 4-5.  As mentioned, although the ALJ is required to "consider a series of [six] specific factors," *Hamlin*, 365 F.3d at 1215, the ALJ is not required to "explicitly discuss" or "apply expressly" every possible factor when weighing a medical opinion.  *Oldham*, 509 F.3d at 1258.  Instead, "in addition to discussing the evidence supporting his decision, the ALJ also must discuss the *uncontroverted*

---

[32] *See* Section V(A)(2)(b) above (citing AR 442 (ALJ providing good reasons for giving Dr. LaCourt's opinion only "some weight" and specifically stating that "[his] opinion that [Plaintiff] had marked limitations in ability to *carry out instructions*, to *work without supervision* and to *interact with supervisors* and coworkers is inconsistent with [Plaintiff's] testimony regarding how he obtained methamphetamines during this period" (emphasis added)). Furthermore, by explaining why she only gave "some weight" to (and thus did not completely adopt) Dr. LaCourt's opinions, the ALJ was therefore not rejecting without "*any* explanation" the evidence within these opinions. *Robinson*, 366 F.3d at 1083; *Clifton*, 79 F.3d at 1010; *see also supra* note 28 (citing examples where the ALJ failed to discuss significantly probative evidence, none of which include instances of an ALJ actually explaining the weight that he or she gave to an opinion—but then being found to have committed error by not *further* discussing or weighing certain *facets* of the already-weighed opinion).

[33] Plaintiff cites to *Trujillo v. Colvin*, 626 Fed. Appx. 749, 751 (10th Cir. 2015) (unpublished) to support his position. The court in *Trujillo* held that the ALJ "failed to satisfy [the] requirement" that he "at least (1) consider [a medical opinion from doctor during his cross-examination, which was "distinct" from a separate opinion he gave on direct-examination] and (2) state whether he agreed with [the doctor's opinion]." *Id.* (citing Clifton, 79 F.3d at 1009-10). In the instant matter, however, the ALJ considered the two "distinct" opinions from Dr. LaCourt, one in 2011 and the other in 2013, and explained the weight she gave them—and even explicitly discussed why she discounted the specific limitations within that opinion that Plaintiff now highlights.  AR 442; Mot. 12-15; Reply 3-4.  In any event, the Court is aware of no legal authority, either in *Trujillo* or elsewhere, that would require every limitation *within* an opinion— or even certain limitations within an opinion, such as "marked" limitations that were not adopted by the ALJ—to also be considered as "distinct" opinions that must likewise be separately discussed and weighed.

*evidence* he chooses not to rely upon, as well as *significantly probative* evidence he rejects." *Clifton*, 79 F.3d at 1010 (emphasis added). But Plaintiff does not argue that these treatment records—which consist of little more than records documenting Plaintiff's statements during counseling and treatment about his symptoms, Plaintiff's prescribed medications, and observations and assessments of Plaintiff, including the "Global Assessment of Functioning" ("GAF") ratings,[34] *see* Mot. 15-21—are themselves uncontroverted or significantly probative. Instead, he argues that the ALJ should have also discussed how certain aspects of these treatment records might also have supported certain limitations assessed by Dr. LaCourt. *See*, e.g., Mot. 16. The ALJ, however, provided "good reasons" for his decision to assign "some weight" to Dr. LaCourt's opinion— reasons that are supported by "more than a mere scintilla" of evidence. *Biestek*, 139 S. Ct. at 1154; *see supra* Section V(A)(2)(b). This Court therefore holds that substantial evidence supported this decision and that the ALJ was not required to also discuss how the evidence could have supported a different conclusion.[35]

### 3. The ALJ Properly Weighed Drs. Henderson and Walker's Opinions

Plaintiff asserts that the ALJ was required to either discuss or adopt certain facets of the opinions of the nonexamining psychological consultants, Drs. Henderson and Walker. Mot. 21-

---

[34] The ALJ did review these ratings but stated that "[t]he Commissioner has declined to endorse the GAF scale for 'use in Social Security and SSI disability programs' and has indicated GAF ratings have no 'direct correlation to the severity requirements [of the] mental disorders listings.'" AR 444 (citing 65 Fed. Reg. 50746, 50764-65 (2000)). In addition, the ALJ noted that these ratings are merely a "snapshot" of functioning at a particular time, "are not an indication of overall functioning," and are not intended to assess disability. *Id.* Furthermore, although the ALJ gave "some weight" to these ratings, he instead chose to "rely on evidence that demonstrates [Plaintiff's] overall ability to function." *Id.*

[35] *See Zoltanski*, 372 F.3d at 1200 (stating that "[t]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence" and that a court therefore "may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo"); *Allman v. Colvin*, 813 F.3d 1326, 1333 (10th Cir. 2016) ("In short, the record contains support for both the notion that [the claimant] has extreme deficiencies in concentration, persistence, and pace, and the notion that his mental limitations are not that severe. The ALJ was entitled to resolve such evidentiary conflicts and did so." (citations omitted)).

23; Reply 5-6 (also stating that each of Plaintiff's claims regarding the weighing of Dr. Henderson's opinion "applies to Dr. Walker's opinion as well"). Specifically, Plaintiff asserts that the ALJ erred by not discussing or adopting certain of the twelve to thirteen "Section I, Summary Conclusion" subcategories in which these doctors checked boxes that rated Plaintiff as having "moderately limited" mental abilities in certain areas. *Id.*; AR 174-75, 341-42.[36] The Court disagrees.

As explained in Section V(A)(2)(c) above, the issue is not whether the ALJ discussed or adapted every facet of these opinions—or, more specifically, those facets identified by Plaintiff. Rather, the issue is whether the ALJ "provided good reasons in [her] decision for the weight [she] gave to [these] opinions." *Oldham*, 509 F.3d at 1258. And the Court finds that the ALJ provided such reasons. First, although "the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all," *Robinson*, 366 F.3d at 1084, the ALJ nevertheless gave these opinions[37] "some weight." AR 443-44. Second, unlike her previous decision—in which she found "essentially *identical* limitations" as these consultants (but then inexplicably did not include all such limitations in her RFC findings), *Roper*, 2017 U.S. Dist. LEXIS 35955, at *30-31, 35

---

[36] These specific "Section I" summary conclusions consist of "moderately limited" ratings for (1) working with supervision, (2) following "detailed instructions," (3) responding appropriately to "changes in the work setting," and (4) "set[ting] realistic goals." Mot. 21-23; AR 174-75, 341-42. In explaining these summary conclusions, however, Dr. Walker stated that Plaintiff nevertheless *had* the capacity to (1) "interact adequately with . . . supervisors," (2) follow "simple instructions," and (3) "respond appropriately to changes in a routine work setting." AR 341-43.

[37] Each consultant's opinion actually consisted of not only a preliminary "summary conclusions" section (in which boxes are checked to rate various limitations—and which Plaintiff highlights in his Motion), but also a concluding "narrative" section (in which a "*[d]etailed explanation*" of these summary conclusions is provided). AR 174-76, 341-43 (emphasis added). In these concluding "narrative" sections, Dr. Henderson stated that "the overal[l] objective medical evidence supports retention of capacity for simple and repetitive tasks in an environment in which interpersonal contact is only incidental." AR 176. And Dr. Walker stated that Plaintiff could "carry out simple instructions, make simple decisions, attend and concentrate for two hours at a time, interact adequately with co-workers and supervisors, and respond appropriately to changes in a routine work setting." AR 343.

(emphasis added)—the ALJ articulated her reasons for crediting, but not completely adopting, these opinions.[38]

In articulating why she gave Dr. Henderson's opinion "some weight," the ALJ explained that she (1) considered his status as an "acceptable medical source," (2) found his opinion to be "*generally consistent* with objective treatment records," and (3) found that Plaintiff's reported "activities . . . indicate[d] that he [was] less limited than Dr. Henderson opined." AR 443 (emphasis added).[39] Similarly, in explaining why Dr. Walker's opinion was also given such weight, the ALJ explained that he (1) considered his status as an "acceptable medical source," (2) found his opinion to be "*largely supported* by objective treatment records," (3) found that "his opinions were inconsistent in places," and (4) found that he failed to address "Dr. LaCourt's 2013 opinion that the claimant had schizophrenia." AR 444 (emphasis added). The Court finds that the ALJ therefore provided "good reasons" for the weight given to these opinions. *Oldham*, 509 F.3d at 1258. Consequently, the Court holds that the ALJ did not err in weighing these opinions and that "[n]othing more was required." *Id.*

## B. The ALJ Did Not Err in Relying on Plaintiff's Medical Non-Compliance

Plaintiff also argues that the ALJ's RFC finding was erroneous because she relied on Plaintiff's "long history of being non-medically compliant." Mot. 23-24 (quoting AR 445). Specifically, he suggests that the ALJ might have concluded, but without adequate explanation,

---

[38] *See Golden-Schubert*, 2019 U.S. App. LEXIS 22526, at *12 (holding that "the ALJ applied the correct legal standard in weighing [a nonexamining psychological consultant's] opinion" when the ALJ "specified the weight he gave to [the consultant's] opinion, articulated the reason for that weight, and cited those portions of the record that supported that reason").

[39] As noted, the activities cited by the ALJ in her review of this opinion consisted of "shop[ping] at Walmart, play[ing] video games and watch[ing] television daily." AR 443. The ALJ, however, did not solely rely on these activities in giving this nonexamining consultant's opinion "some weight," as she also considered both Dr. Henderson's status and the consistency of his opinion with the treatment records. Furthermore, the Court concludes that "[s]ubstantial evidence supports [her] decision on this point." *Doyal*, 331 F.3d at 761, 764.

that he unjustifiably failed to "follow treatment prescribed by a treating source . . . . [that] [was] clearly expected to restore [his] capacity" to work.  SSR 82-59 (rescinded October 29, 2018); Mot. 23-24; Reply 6-7.[40]  In addition, Plaintiff argues that the ALJ erred by not considering whether his mental impairments or a possible inability to obtain insurance were responsible for his lack of treatment or compliance.  Mot. 24; Reply 7-8.  As explained below, the Court disagrees.

First, as a factual matter, the ALJ did not make a finding—unstated or otherwise—that Plaintiff was not disabled because he unjustifiably failed to follow a treating source's prescribed treatment.  Instead, the ALJ observed that—in addition to a nearly five-year gap in treatment and his otherwise "*irregular* care for his alleged disabling mental conditions"—Plaintiff had "a long history of being nonmedically compliant," which included "continuing his polysubstance use against medical advice," "not following up with providers as directed," and "not promptly filling prescribed medications." AR 445.  By noting Plaintiff's large gap in (and also irregular) treatment, Plaintiff's drug abuse against medical advice, and this lack of following up or promptness, the ALJ was not thereby finding that a particular "treatment prescribed by a treating source" was "clearly expected to restore [his] capacity" to work—but that Plaintiff unjustifiably failed to follow this specific, restorative treatment.  SSR 82-59.  Consequently, the Court holds that the ALJ did not somehow erroneously apply the standards in 82-59.[41]

---

[40] Pursuant to SSR 82-59, if Plaintiff would "otherwise be found to be under a disability," an ALJ may then deem him to not be disabled by "virtue of such failure" to follow this prescribed, restorative treatment from a treating source.

[41] *See Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000) (finding that—because the ALJ "did not purport to deny plaintiff benefits on the ground he failed to follow prescribed treatment"—plaintiff's arguments concerning the ALJ's analysis of his lack of treatment were "misplaced" (citing 20 C.F.R. § 404.1530; SSR 82-59) (distinguishing *Frey v. Bowen*, 816 F.2d 508, 517 (10th Cir. 1987))); *Johnson v. Colvin*, 640 F. App'x 770, 774 (10th Cir. 2016) (unpublished) ("[W]hen, as here, noncompliance with prescribed treatment is invoked not as independent basis for denying disability but only as a factor diminishing the credibility of a claimant's allegations of the severity of symptoms prompting the treatment, the ALJ need not also find the forgone treatment would have restored the claimant's ability to work." (citing *Qualls*, 206 F.3d at 1372)).

Next, the ALJ did not erroneously fail to consider Plaintiff's mental impairments or his potential inability to obtain insurance as reasons for his noncompliance or lack of medical treatment. To begin, the applicable regulation states that an ALJ may not find that a claimant's "symptoms [to be] inconsistent with the evidence in the record" due to the lack in "frequency or extent of the treatment," unless the ALJ "consider[s] possible reasons [the claimant] may not comply with treatment or seek treatment." SSR 16-3p, 81 Fed. Reg. 14166, 14170 (Mar. 16, 2016). In the many reasons provided for finding that Plaintiff's statements about his symptoms were not "entirely consistent with the medical evidence and other evidence in the record," *see* AR 440-446; *supra* Section IV(A), the ALJ *discussed* Plaintiff's noncompliance and lack of treatment—but did not state that such a finding was because of this noncompliance or lack of treatment. *See* AR 445.

Assuming that such a finding of inconsistency was at least partially based on Plaintiff's noncompliance and lack of treatment, Plaintiff nevertheless led the ALJ to believe that the explanation for his lack of treatment was his uninsurance—not his mental limitations.[42] And although the ALJ asked about—and discussed—Plaintiff's insurance, there was simply no evidence, or even an assertion by Plaintiff, that this noncompliance and lack of treatment was caused by an *inability* to obtain insurance or "free or low cost medical services." SSR 16-3p; *see* AR 445, 575, 587, 592; Mot. 23-24; Reply 7-8. The Court therefore finds that, consistent with SSR 16-3p, the ALJ considered whether Plaintiff was *unable* to "afford treatment" or "low-cost

---

[42] *See* AR 575 (Plaintiff stating that he "just got [his] insurance back" and was working on getting counseling), 587 (ALJ discovering that Plaintiff acquired insurance "[a] few months ago," e.g., around October 2017, but was "out of insurance until then," and asking Plaintiff if he saw anyone from "2014 onward," and Plaintiff responding "[n]ot without insurance, you can't") 592 (Plaintiff's mother affirming that "recently he hasn't been under any care because he was uninsured"); *see also* Mot. 23-24; Reply 7-8 (Plaintiff generally referencing his reported isolation—but citing no evidence, and containing no assertion, that his mental limitations actually caused him to be noncompliant or miss such treatment); *Adams v. Colvin*, 553 Fed. Appx. 811, 812-16 (10th Cir. 2014) (unpublished) (rejecting Plaintiffs argument that, because Plaintiff was bipolar and suffered from "antisocial personality disorder," the ALJ erred in considering Plaintiff's noncompliance, reasoning that Plaintiff "fail[ed] to cite any evidence that . . . his intermittent pursuit of mental-health treatment [was] the result of his mental illnesses").

medical services," and that he correctly observed that Plaintiff gave no explanation for "why he had not obtained insurance sooner or why he had not sought care for his allegedly disabling conditions for approximately 5 years." AR 445. Consequently, the Court holds that the ALJ did not err in discussing Plaintiff's noncompliance and lack of treatment.

**C. The ALJ Did Not Err in Concluding that Plaintiff Could Adjust to Other Work**

Plaintiff claims that the ALJ's conclusion at step five, i.e., that he could "successful[ly] adjust[] to other work . . . in the national economy," was erroneous because it was (1) based on an erroneous RFC and (2) contained a "likely inconsistency" between the vocational expert testimony and the DOT that the ALJ "failed to explore." Mot. 24-25; Reply 8; AR 447. The Court disagrees.

First, given the above findings, *see* Section V(A)-(B), the fact that Plaintiff presents no additional arguments attacking the RFC, *see* Mot. 24-25, and the evidence supporting the RFC, *see* Section IV(B)(2), the Court holds that the ALJ's RFC was supported by substantial evidence and therefore not erroneous. Consequently, the Court further holds that the ALJ's step five conclusion was not improperly based on an erroneous RFC.

Second, Plaintiff argues that two of the three jobs presented by the vocational expert to the ALJ contained a "likely inconsistency" that "the ALJ failed to explore." Mot. 24-25. Specifically, he argues that the ALJ should have addressed a "likely inconsistency" between (1) the vocational expert's testimony that the Plaintiff, whom the ALJ limited to following "*short, simple* instruction," AR 438 (emphasis added), could perform the occupations of marker and cafeteria attendant and (2) the DOT, which classifies these jobs as level-two reasoning occupations, which therefore require a "commonsense understanding to carry out *detailed but uninvolved* written or oral instructions," *Hackett*, 395 F.3d at 1176 (emphasis added) (quoting DOT, Vol. II at 1011). Mot. 24-25.

An "ALJ must investigate and elicit a reasonable explanation for any conflict between the Dictionary [of Occupational Titles] and expert testimony before the ALJ may rely on the expert's testimony as substantial evidence to support a determination of nondisability." *Haddock v. Apfel*, 196 F.3d 1084, 1091 (10th Cir. 1999).[43] Such a conflict existed in *Hackett*, 395 F.3d 1168, when a vocational expert testified that a claimant with an RFC for "simple and routine work tasks" could perform certain jobs—but when the DOT classified those same jobs as requiring "a reasoning level of three," a classification that "seem[ed] inconsistent" with the claimant's RFC. *Id.* at 1172, 1176.[44] And because the vocational expert never addressed this issue, the court held that the ALJ was required to "address the apparent conflict." *Id.* at 1175-76.

After characterizing this "a developing area of the law," Plaintiff cites to *Paulek v. Colvin*, 662 Fed. Appx. 588 (10th Cir. 2016) (unpublished), where the court observed in dicta that "the Eighth Circuit has held that a limitation to simple instructions is *inconsistent* with both level-two and level-three reasoning." *Id.* at 594 (emphasis added) (citing *Lucy v. Chater*, 113 F.3d 905, 909 (8th Cir. 1997)); Reply 8.[45] Consistent with previous holdings in this District, however, this Court "does not interpret *Paulek's* reference to *Lucy* as a suggestion, much less a holding in the Tenth Circuit, that level-two reasoning jobs are inconsistent with simple, unskilled work" or simple instructions. *Tenorio v. Berryhill*, Civ. No. 17-138 SCY, 2018 U.S. Dist. LEXIS 211086, at *40

---

[43] *See also Poppa v. Astrue*, 569 F.3d 1167, 1173 (10th Cir. 2009) (noting SSR 00-4p's requirement that the ALJ resolve any conflicts between a vocational expert's testimony about a job and that job description in the DOT); SSR 00-4p, 65 Fed. Reg. 75759, 75760 (Dec. 4, 2000) (requiring the ALJ to resolve such conflicts "by determining if the explanation given by the [vocational expert] is reasonable and provides a basis for relying on the [vocational expert] testimony rather than on the DOT information").

[44] "[A] reasoning level of three [is] defined as the ability to 'apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form, and deal with problems involving several concrete variables in or from standardized situations.'" *Id.* at 1176 (quoting DOT, Vol. II at 207, 281, 1011).

[45] Plaintiff also cites to *Thomas v. Berryhill*, 916 F.3d 307 (4th Cir. 2019), where the Fourth Circuit held that there was an "apparent conflict" between an RFC limitation, which required "short, simple instructions," and level-two reasoning, which required "detailed but uninvolved . . . instructions." *Id.* at 313; Reply 8.

(D.N.M. Dec. 14, 2018).[46]  "Instead, *Paulek* established that *Hackett* controls, and that level-three reasoning jobs are inconsistent with both simple work and simple instructions."  *Id.*[47] Consequently, this Court holds that there were no conflicts between the vocational expert's testimony and the DOT and that the ALJ therefore properly concluded that Plaintiff could successfully adjust to other work.[48]

## VI.  CONCLUSION

For the foregoing reasons, the Court holds that the ALJ applied the correct legal standards and that her findings and decision were supported by substantial evidence.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion is **DENIED**.

**IT IS FURTHER ORDERED** that the Commissioner's final decision is **AFFIRMED** and that the instant cause is **DISMISSED WITH PREJUDICE**.

---

[46] *See also Adolph v. Berryhill*, Civ. No. 17-0191 KBM, 2018 U.S. Dist. LEXIS 46551, at *27 (D.N.M. Mar. 21, 2018) (holding that a limitation to simple instructions is not inconsistent with level two reasoning); *Kerr v. Berryhill*, Civ. No. 16-799 GJF, 2017 U.S. Dist. LEXIS 130946 at *44-45 (D.N.M. Aug. 16, 2017) (same); *Begaye v. Berryhill*, No. 16-CV-0281 SMV, 2017 U.S. Dist. LEXIS 138501, *21-22 (D.N.M. Aug. 29, 2017) (holding that a limitation to simple work is also not inconsistent with level two reasoning).

[47] *See also Hackett*, 395 F.3d at 1176 (observing that "level-two reasoning appears more consistent with" the RFC for "simple and routine work tasks"); *Stokes v. Astrue*, 274 Fed. Appx. 675, 684 (10th Cir. 2008) (unpublished) (reiterating that "a limitation 'for simple and routine work tasks' was inconsistent with the demands of level-three reasoning but consistent with the demands of level-two reasoning" (citing *Hackett*, 395 F.3d at 1176)).

[48] Even assuming that an inconsistency exists between level-two reasoning jobs and a limitation to following short, simple instructions, "the ALJ's failure to resolve such a potential conflict is a harmless error.  The Tenth Circuit has held that only one of three jobs identified by a VE needs to have significant numbers in the national economy to support a finding of nondisability at step five." *Adolph*, 2018 U.S. Dist. LEXIS 46551, at *27-28 (citing *Raymond v. Astrue*, 621 F.3d 1269, 1274 (10th Cir. 2009) (unpublished); *see also id.* at *28 (noting that although the Tenth Circuit "'has never drawn a bright line establishing the number of jobs necessary to constitute a significant number,' the court has found that 152,000 jobs in the national economy is a significant number" (quoting *Trimiar v. Sullivan*, 966 F.2d 1326, 1330 (10th Cir. 1992))(citing *Stokes*, 274 Fed. Appx. at 684; *Raymond*, 621 F.3d at 1274 n.2)).  Thus, given that the level-one reasoning occupation of "cleaner/housekeeper"—which contained "over 260,000 jobs," AR 447—would still be available even if the two level-two reasoning occupations were eliminated, this Court holds that any failure by the ALJ to resolve a potential "level-two reasoning" versus "simple instruction" conflict is harmless error.

**SO ORDERED.**

_____
THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE
***Presiding by Consent***